UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
UNITED STATES OF AMERICA,

                                       10 CR 918 (RPP)

           - against -

                                      **OPINION & ORDER**

ARON CHERVIN, et al.,

                 Defendants.
------------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

        By motion dated June 1, 2011, Defendant Michael Lamond ("Lamond") moved to

suppress nineteen telephone conversations between himself and Defendant Aron Chervin

intercepted by the Federal Bureau of Investigation ("FBI") pursuant to court-authorized wiretaps.

Defendant argues that the communications are protected by the attorney-client privilege because

Aron Chervin was a client.  Subsequent to Defendant Lamond's filing of this motion, Defendants

Aron Chervin, Valiantsina Lahun, and Judson Just joined the motion.  On July 1, 2011, the

Government responded in opposition to Defendant's motion.  On July 14, 2011, Defendant

submitted a reply.  For the reasons that follow, the motion to suppress is denied.

**I.**      **Background**

        On October 6, 2010, a Grand Jury indicted Defendants Aron Chervin, et al., charging

Defendants with conspiracy to engage in a scheme to commit mail fraud and healthcare fraud, 18

U.S.C. § 1349, conspiracy to sell confidential patient information, 18 U.S.C. § 371, and

conspiracy to commit money laundering, 18 U.S.C. § 1956(h). (Indictment ("Indict.") dated

October 7, 2010.)  The indictment alleges that the Defendants' scheme sought to "systematically

defraud no-fault insurance carriers by submitting fraudulent claims for medical services and

equipment." (Id. ¶ 1.)  In furtherance of the scheme, patients[1] were recruited to fraudulent clinics nominally controlled by a medical professional but ultimately operated by Defendants. (Id. ¶ 6, 17.)  The alleged conspirators recruited patients who they knew were recently involved in car accidents and paid hospital employees to provide patient information of individuals recently involved in accidents. (Id. ¶ 13.)  Once at the clinic, participating doctors would subject the patients to excessive, unnecessary, or fraudulent tests to generate false claims for treatment and equipment to be submitted to the no-fault insurance providers. (Id. ¶ 7.)  Additionally, Defendants are charged with creating wholesale and retail shell corporations to perpetuate the fraudulent sale of Durable Medical Equipment ("DME") to obtain inflated reimbursement from no-fault insurance providers, (Id. ¶ 9.), and financing their scheme through the sale of fraudulent receivables of the clinics to investors who benefitted from the inflated reimbursement generated by the fraud even though New York State prohibits medical professionals from sharing fees for medical services with non-medical professionals. (Id. ¶ 20.)  These sophisticated schemes also utilized the services of lawyers to represent patients, to facilitate payments, and to prevent the insurance companies from detecting the possibility of fraud. (Id. ¶ 21.)

The indictment also alleges that the scheme involved billing for invoices generated by the medical professional corporations and submitted to no-fault insurers through the Law Office of Akiva Ofshtein, P.C., which employed Defendant Lamond and Defendant Vadim Chervin. (Id. ¶¶ 6, 21.)  Defendant Lamond is allegedly an attorney licensed to practice in New York State and an expert in the submission of no-fault insurance claims. (Id.)  The indictment alleges that Lamond's services were used to draft contracts with financiers and to prevent "unwanted scrutiny" from insurers. (Id.)  Furthermore, the indictment alleges that Lamond allowed use of

---

[1] The scheme included the recruitment of actual patients injured in legitimate accidents as well as patients who were "injured" in staged or exaggerated accidents.

his attorney's escrow account to receive monies from financiers purchasing the inflated receivables. (<u>Id.</u> ¶ 22.)  This arrangement allowed members of the conspiracy to shield the fact that the insurance payments were received by certain members of the conspiracy rather than the relevant medical corporation. (<u>Id.</u>)

## II.      The Attorney-Client Privilege and The Crime Fraud Exception

The rationale for the attorney-client privilege is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice."  <u>Upjohn Co. v. United States</u>, 449 U.S. 383, 389 (1981).  Clients must feel free to disclose to their attorneys a full and fair rendering of their past wrongdoings so that attorneys will best be able to provide competent and skillful legal assistance.  <u>See</u> <u>Fisher v. United States</u>, 425 U.S. 391, 403 (1976).  The privilege, however, is not an unbridled license which protects all communications between attorney and client, and thus there are exceptions to the general rule.  One of these exceptions is commonly referred to as the crime-fraud exception.  Under this exception, the privilege "ceases to operate at a certain point, namely, where the desired advice refers *not to prior wrongdoing,* but to *future wrongdoing.*" <u>United States v. Zolin</u>, 491 U.S. 554, 562-63 (1989) (quoting 8 Wigmore, § 2298, p. 573) (emphasis in original).  Nor can the privileged communications between an attorney and client be carried on with the purpose of furthering or enabling a crime or fraud. <u>See</u> <u>In re Richard Roe, Inc.</u>, 68 F.3d 38, 40 (2d Cir. 1995).

It is well-settled that the party asserting the attorney-client privilege bears the burden of establishing that all the elements of the privilege are present.  <u>See</u> <u>United States v. Int'l Bhd. of Teamsters</u>, 119 F.3d 210, 214 (2d Cir. 1997); <u>United States v. Schwimmer</u>, 892 F.2d 237, 244 (2d Cir. 1989).  Defendant Lamond contends that an attorney-client relationship had been

established between himself and Defendant Aron Chervin.  The Government argues that it is not aware of any retention letter, notice of appearance, legal bills, or any such supporting documents that would indicate an attorney-client relationship. (Government's Omnibus Memorandum of Law in Opposition to Pre-trial Motions ("Gov. Mem."), dated July 1, 2011 at 46.)  Lamond does not dispute this point, but rather argues that the contents of challenged interceptions clearly demonstrate the existence of an attorney-client relationship with Aron Chervin. (Suppression Hear'g Transcript ("Tr.") at 13.)

The attorney-client privilege is found to exist "(1) where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor ." In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983, 731 F.2d 1032, 1037 (2d Cir. 1984). Lamond contends that he was providing "legitimate legal services to his client by consulting with him concerning financing, no-fault collections, and arbitrations." (Defendant's Memorandum of Law in Support of Motion to Suppress ("Def.'s Mem.") dated June 1, 2011 at 4.)  The Court will assume as true Lamond's points that an attorney-client privilege was established with Defendant Aron Chervin.

**A.     The Government Bears the Burden of Establishing the Crime-Fraud Exception**

Assuming Defendant Lamond has met the burden of establishing a privilege, the Government contends that Lamond must show that the communications were not made for the purposes of committing a crime or fraud. See In re Richard Roe, Inc., 68 F.3d at 40.  Defendants argue, however, that the Government bears the burden of proof in establishing the crime-fraud exception. (Def.'s Mem. at 4.)  The Second Circuit has held that the party seeking to invoke the

4

crime-fraud exception must prove there is a "factual basis for a showing of probable cause to believe that a fraud or crime has been committed and that the communications in question were in furtherance of the fraud or crime." United States v. Jacobs, 117 F.3d 82, 87 (2d Cir. 1997) (citing In re John Doe, Inc., 13F.3d 633, 637 (2d Cir. 1994));  In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983, 731 F.2d 1032, 1039 (2d Cir. 1984).  The fraudulent objective of the scheme, however, "need not be established definitively; there need only be presented a reasonable basis for believing that the objective was fraudulent."  In re Grand Jury Subpoena Duces, 731 F.2d at 1039.

**B.     The Crime-Fraud Exception Does Not Require an Attorney to Knowingly Participate in the Crime**

Defendant Lamond argues that he is "clearly providing legitimate legal services to his client by consulting with him concerning financing, no-fault collections, and arbitrations." (Def.'s Mem. at 4.)  However, the attorney-client privilege will not attach to any communications in furtherance of a crime or fraud *regardless* of the attorney's lack of knowledge that he is being consulted in furtherance of that crime or fraud.  See Clark v. United States, 289 U.S. 1, 15 (1933) ("Nor does the loss of the privilege depend upon the showing of a conspiracy, upon proof that client and attorney are involved in equal guilt.  The attorney may be innocent, and still the guilty client must let the truth come out."); In re Grand Jury Proceedings, 674 F.2d 309, 310 (4th Cir. 1982); United States v. Gotti, 771 F. Supp. 535, 543 (E.D.N.Y. 1991).   Therefore, Lamond's knowledge of whether a fraudulent scheme was afoot is not relevant to the application of the crime-fraud exception to Lamond's interactions with Aron Chervin.  What is relevant is the nature of the Government's evidence of Aron Chervin's actions which Lamond assisted.

**C.      The Government has Demonstrated Probable Cause that Defendant Aron Chervin Utilized Mr. Lamond's Services to Further His Fraudulent Scheme**

To establish that communications were in furtherance of the fraudulent scheme, the Government must be able to demonstrate that the "particular communication with counsel or attorney work product was *intended* in some way to facilitate or conceal the criminal activity." In re Richard Roe, Inc. v. Richard Roe Inc. et. al., 168 F.3d 69, 71 (2d Cir. 1999) (emphasis in original).  However, communications that merely *relate* to the fraudulent scheme will not trigger the crime-fraud exception to the attorney-client privilege. See Jacobs, 117 F.3d at 88.  The intercepted calls demonstrate that Aron Chervin used the services of Lamond and the Law Office of Akiva Ofshtein, P.C., to (1) submit fraudulent bills and collect money from no-fault insurers, (2) draft contracts with doctors and investors in furtherance of the fraudulent scheme, and (3) launder monies garnered through the fraudulent scheme.

**III.     The Applicable Wiretaps**

The Government's memorandum of law in opposition to Lamond's motion relied on selected excerpts from FBI agents' affidavits in support of authorizations for the electronic surveillance of Aron Chervin's cell phone to establish probable cause that Aron Chervin was engaged in fraudulent criminal conduct.  At oral argument, the Court requested that the applications cited be submitted in their entirety so that the Court could verify that the Government's probable cause contentions were based on events prior to the Government receiving authority from courts authorizing the agents to record telephone calls between Aron Chervin and Lamond which the government previously minimized.[2]  The Government has

---

[2] The Government states that as required in the order submitted to and signed by Judge McKenna on May 6, 2010, the United States Attorney's Office gave instructions—prior to the interception of any calls—to the monitoring agents to minimize any intercepted conversations between Aron Chervin and any lawyer. (Gov.'s Mem. at 32-33.) Monitoring agents were to call a supervising agent any time they discerned that an attorney was participating in an

provided these affidavits dated May 6, 2010, and June 28, 2010.[3]

On May 6, 2010, the Hon. Lawrence M. McKenna signed an electronic surveillance authorization pursuant to 18 U.S.C. § 2518 to intercept telephone calls originating from the telephone number subscribed to by Defendant Aron Chervin (Application in Support of Electronic Interception dated May 6, 2010 ("05/06/10 Application"). The May 6, 2010, order instructed agents to "avoid infringing upon any attorney-client privilege or other recognized privileges." (Affidavit of Special Agent Jeffrey S. Koch in Support of Application dated May 6, 2010 ("Koch Aff. 05/06/10") ¶ 64.) In support of the application, Special Agent ("SA") Koch stated that, based on toll analysis, he was aware that Defendant Aron Chervin was making frequent phone calls to the Law Office of Akiva Ofshtein P.C. where Defendant Vadim Chervin and Defendant Michael Lamond were employed. (Id. ¶ 39.) The Government, upon learning that Lamond was an attorney, took measures to minimize automatically interceptions of  his cellular communications with Chervin. (Gov. Mem. at 34.) However, based on conversations intercepted from the May 6, 2010, order, the Government provided notice with its renewal application to the Hon. Sidney H. Stein dated June 28, 2010, that it would begin to intercept conversations between Defendant Lamond and Defendant Aron Chervin. (Id. at 35.) The Government stated that it believed that the conversations between Lamond and Chervin were in furtherance of the no-fault insurance fraud being perpetrated and therefore were subject to the crime-fraud exception to the attorney-client privilege. (Id.) As a prophylactic measure, the Government's letter to Judge Stein described the employment and procedures of a "wall team" to intercept calls between Chervin

---

intercepted conversation. Id. Further, if an agent determined that the conversation was one in which an attorney was providing legal advice, the agent was instructed to stop recording immediately and deliver the tape to the supervisor. Id. at 33. Agents were informed that they were not to discuss the attorney-client conversation with any other agents unless and until the supervising agent gave them permission to do so. Id. The Court requests a supporting affidavit from AUSA Harrington confirming that the minimization instructions were given to and carried out by the agents. The Court requests this supporting affidavit to be provided within one week.

[3] The Government also provided affidavits dated July 29, 2010, and September 8, 2010 that this opinion does not rely on.

and Lamond. (<u>Id.</u> at 32-34.)  This "wall team" would include an Assistant United States Attorney and a designated FBI agent who would not participate in the investigation beyond their duties on the "wall team." (<u>Id.</u>)  Subsequently, the Government applied for and received extensions of the electronic surveillance authorization on June 28, 2010, July 29, 2010, and September 8, 2010.[4] (<u>Id.</u> at 35-36.)  Accordingly, the Court reviewed the Government's applications for wiretap authorizations stating the knowledge obtained by the Government prior to June 28, 2010, to determine if there was probable cause prior to June 28, 2010, for the Government to conclude that Aron Chervin was engaged in healthcare fraud and was utilizing Michael Lamond in furtherance of the fraud.

**A.      The May 6, 2010, Affidavit of SA Jeffrey S. Koch**

<em><u>Robert Terdjanian</u></em>

The first application for wiretap authorization for the investigation of persons named in the indictment was made in May 2009 and involved Medicare fraud, and authorized the interceptions of "Robik Phone 1" used by Defendant Robert Terdjanian.  The investigation relating to charges contained in the indictment revealed relevant information occurring before May 6, 2010, the date of SA Koch's affidavit supporting intercepts of the Aron Chervin Phone 1.

SA Koch learned from another agent assigned to this investigation ("Agent 1") that the identities of 5,600 Medicare beneficiaries were stolen in 2007 and have been used around the country to commit healthcare fraud. (<u>Id.</u> ¶ 19.)  SA Koch learned that a doctor ("Doctor 1") had his identity stolen and that an individual had opened a medical clinic in his name ("Doctor 1 clinic"). (<u>Id.</u>)  Agent 1 reported to SA Koch that on or about March 30, 2009, Medicare received a Medicare enrollment application from Doctor 1 stating that his practice was located at 2754

---

[4] The June 28, 2010, authorization was signed by the Hon. Sydney H. Stein, the July 29, 2010, authorization was signed by the Hon. George B. Daniels, and the September 8, 2010, authorization was signed by the Hon. Richard J. Sullivan.

Coney Island Avenue, #38, Brooklyn, New York ("the Coney Island address"). (Id. ¶ 19.)  The application instructed Medicare to deposit Medicare payments into a particular bank account at HSBC ("Doctor 1 bank account").  On May 13, 2009, Medicare approved Doctor 1 as a Medicare service provider. (Id.)

Beginning in May 2009 through and including September 2009, Medicare received numerous bills from the Doctor 1 Medicare account totaling more than $1,800,000. (Id. ¶ 19.) Beginning July 27, 2009, Medicare began making payments for bills submitted under Doctor 1's Medicare account and deposited into Doctor 1's bank account at HSBC. (Id.)  From July 2009 to September 2009, Medicare paid $1,078,000 into Doctor 1's bank account in the form of wire transfer credits. (Id.)  Many of the listed beneficiaries for these treatments had been flagged by Medicare as victims of identity theft. (Id.) During the July 27, 2009, to September 30, 2009 timeframe, at least $429,000 had been distributed to Terdjanian's alias "Oleg Kamarine" and $37,000 to Telya Corp. (Id. ¶ 21.)  On or about September 3, 2009, Terdjanian, using the cell phone designated by the FBI as "Robik Phone 1", called a phone number associated with HSBC and identified himself as "Oleg Kamarine" and stated that he was the sole owner of Teyla Corp. (Id.)  On or about October 2, 2009, the FBI directed HSBC to freeze the account associated with Doctor 1. (Id. ¶ 20.)

On August 21, 2009, Agent 1 spoke to Doctor 1, a plastic surgeon  in Paramus, New Jersey. (Id. ¶ 19.)  Doctor 1 stated that his identity had been stolen and that he had reported the theft to law enforcement. (Id.)  Doctor 1 stated that he is licensed in New York but has no practice in Brooklyn or any other part of New York. (Id.)  His only practice is located in New Jersey.  Doctor 1 stated that he is a Medicare provider, but the Doctor 1 Medicare account is not his Medicare account. (Id. ¶ 19.)  FBI surveillance of Doctor 1's "clinic" at the Coney Island

address reveals that the address is simply a mail drop location. (<u>Id.</u>)

SA Koch stated that he received the HSBC bank records from the Doctor 1 bank account and learned that the account was opened in the name of the Doctor 1 clinic on March 19, 2009 through the use of a fraudulent New York State driver's license in the name of Doctor 1 containing a photo of an unidentified individual. (<u>Id.</u> ¶ 20.)

### *AVR Medical Supply Inc.*

Special Agent Koch states that on November 5, 2009, Aron Chervin, while using the target cell phone, received a call from Terdjanian using Robik Phone 1. (<u>Id.</u> ¶ 23.)  During the call Terdjanian asked Chervin whether or not he had an address. (<u>Id.</u>)  Chervin responded that he did and that "the check and everything will go there." (<u>Id.</u>)  Chervin suggested to Terdjanian that it might be "better to open a P.O. Box," however he wanted to wait to ask his son. (<u>Id.</u>)  Later that day Chervin received another call from Terdjanian using the Robik Phone 1 during which Aron Chervin stated that he had spoken to Vadik (Vadim Chervin) and in response to Terdjanian's question about the address, stated "the guy who makes for the corporation, let him give his own address." (<u>Id.</u>)  Aron Chervin then says "the checks that we will write ourselves will go where we later decide to send them, and what the lawyer's office will arrive to the lawyer's office, and then I will give it to you." (<u>Id.</u>)

On December 21, 2009, Chervin called Terdjanian at Robik Phone 1 and asked "what's the name of our supply company?"  Robert Terdjanian answered, "AVR." (<u>Id.</u> ¶ 26.)  Chervin then asked "what's next," to which Terdjanian replied "Medical Supply Inc." (<u>Id.</u>)  Additionally, on December 21, Robert Terdjanian opened a bank account for AVR at Citibank. (<u>Id.</u> ¶ 27.)  SA Koch obtained records for AVR Medical Supply Inc. from Citibank and found it was incorporated on November 6, 2009 and provided a service of process address as 3000 Ocean

Parkway, Suite 3S, Brooklyn, NY—the home address of Terdjanian's father. (Id. ¶ 24.)  AVR was described as a home-based medical supply company with one employee. (Id. ¶ 27.)  The person listed as president of AVR is Valentina Bubucea. (Id. ¶ 24.)

SA Koch made inquiry of the National Insurance Crime Bureau and learned that AVR had started billing automobile insurance policies, such as Geico, on or about December 10, 2009, in connection with the provision of DME and submitted invoices purporting to show the prices charged by its wholesale supplier, "Telya Corp." (Id. ¶ 33.)  The bank statements associated with this account were mailed to the address of Terdjanian's father. (Id. ¶ 21.)

SA Koch stated that on December 22, 2009 Aron Chervin called Robert Terdjanian using Robik Phone 1 and said "listen how it works.  There is a logo for our company—AVR ." (Id. ¶ 28.)  "We print out the bill, give it to Vadik (Vadim Chervin).  Vadik adds his letterhead Akiva Ofshtein, PC Law Office." (Id.)  On December 23, 2009, Terdjanian informed Chervin that "yesterday we opened it" and that he needed a telephone number to contact Natasha. (Id. ¶ 29.)  Chervin gives Robert Terdjanian the telephone number 347-512-1716 and states that "I warned her (Natasha) that I had a partner, and all that stuff . . . ." (Id.)  Later in the call Chervin stated "I have two checks for you and that they will deposit them into the lawyer's account, deduct 7% and give you the cleared check." (Id.)

On January 11, 2010, Terdjanian used Robik Phone 1 to call his wife, Galina Vovk ("Vovk"), and asked her to call "Igor" at Chase Bank. (Id. ¶ 25.)  Terdjanian instructed his wife what telephone number to use, what address to use, and reminded her that "you know what's your name." (Id.)  During her call to "Igor," Vovk identified herself as "Valentina Bubucea," and provided phone number 347-554-8454, and gave the Coney Island Avenue address as the principal office of AVR—an address previously identified with the Doctor 1 "clinic." (Id. ¶¶ 19,

25.)  Telephone records confirm that the telephone number provided by Vovk is associated with AVR Medical Supply Inc. (Id. ¶ 25.)

The affidavit of SA Rebecca E. Vassilakos dated June 28, 2010 states that during the thirty day interception period beginning May 6, 2010, the FBI received records of insurance claims from the National Insurance Crime Bureau. (Affidavit of Special Agent Rebecca E. Vassilakos in Support of Application dated June 28, 2010, ("Vassilakos Aff. 06/28/10") ¶ 62.)  These claims show that multiple clinics continued to bill for the provision of DME from AVR to no-fault automobile insurance companies. (Id.)  AVR's documentation includes wholesale receipts from Telya Corp. and copies of AVR checks written to Telya Corp signed by "Babucea." (Id.)  Cover letters sent with the AVR bills have directed that insurers send checks in payment to Akiva Ofshtein Law Office. (Id.)  Some documentation contains doctor's examinations including from "New Age Orthopedic Rehabilitation Center" located at 60 West End Ave, 6th Floor, Brooklyn, NY 11235. (Id.)

On January 14, 2010, Chervin called Terdjanian and informed him that they had "their own letterhead" and that "they would give their letter to the doctor and just put it on his desk and the doctor, based on this, will write a prescription to the name that was left on his desk." (Koch Aff. 05/06/10 ¶ 30.)  Chervin goes on to say, "you see he won't fill it out all he does is to write a prescription to some particular name . . . later we fill it out and do with that whatever we need." (Id.)

On January 18, 2010, Aron Chervin called Terdjanian and advised him that he had a supplier "who makes everything in China and will beat any price" and "he will not be giving us invoices." (Id. ¶ 31.)  Terdjanian responded, "this is not a problem" and later says "we would

have to pay a couple of dollars to print invoices." (Id.)  Terdjanian then asked Chervin whether

they need "a bill or initial report" to which Chervin replied that they need "an initial report." (Id.)

Terdjanian instructs Chervin to "just find out what we need to send bills." (Id.)  Chervin then

asks whether "my Vadik [Vadim Chervin] will be taking care of that account." (Id.)

On January 25, 2010, Aron Chervin called Terdjanian on Robik Phone 1. (Id. ¶ 32.)

Terdjanian complained that "we are not going through the price list and cannot find anything.

(Id.)  For example, where we can find out how much they bill for bath board." (Id.)  Chervin

responded, "no problem . . . even if we do something wrong my son (Vadim Chervin) will

correct it later." (Id.)  Chervin and Terdjanian agreed to have Terdjanian's wife "Galya" call

Chervin's wife at 732-986-0254 to ask for the information he needs. (Id.)

On March 8, 2010, Terdjanian used Robik Phone 1 to call Chervin and stated "the check

has arrived" and "just come to the office." (Id. ¶ 34.)  Terdjanian also stated that "instead of $491

they paid $259.99" to which Chervin responded, "for that we have lawyers so let them to get the

rest." (Id.)  Terdjanian also mentioned that one payment was delayed. (Id.)  Chervin responded

by saying "Robik, that's how it's going to be.  Some checks will be going there and some will be

coming straight to the office." (Id.)

On March 9, 2010, Aron Chervin called Terdjanian on Robik Phone 1. (Id. ¶ 35.)

Chervin stated that two more checks had come in and Terdjanian replied "Bro, it's fucking

great!" (Id.) Both men remarked how fast the checks arrived to which Terdjanian replied "knock

on a wood." (Id.)

On March 15, 2010, Aron Chervin called Terdjanian on Robik Phone 1 and stated that

"Vadik (Vadim Chervin) just called that he is coming, bring with him some five-six checks."

(Id.)  Terdjanian laughed and Chervin replied "you owe me a bottle." (Id.)  On March 19, 2010,

Chervin called Terdjanian on Robik Phone 1 and said "just got a call from Lora who said "we have good news, two checks have come." (Id.)  On April 5, 2010, Aron Chervin called Terdjanian on Robik Phone 1 and stated "I brought you some checks, probably worth five grand." (Id.)

**B.     The June 28, 2010, Affidavit of SA Rebecca E. Vassilakos**

By affidavit dated June 28, 2010, SA Rebecca E. Vassilakos reported on activity on cell phone number 732-668-2716, designated by the FBI as "Chervin Phone 1" and subscribed in the name of Aron Chervin of 36 Lake Drive, North Brunswick NJ, 08902. (Vassilakos Aff. 06/28/10 ¶ 7.)

On or about May 7, 2010, Aron Chervin used Chervin Phone 1 to call Harold Pina at 516-610-6920. (Id. ¶ 38.)   Chervin stated he met with Lynn and that he thought the meeting went well.  Pina responded "wonderful." (Id.)  Chervin later asked Pina about whether he wanted to be compensated "on a monthly basis or on a finder's  fee." (Id.) Chervin  further explained that "we [sic] looking for long relationship, we're not looking to steal a doctor and forget it." (Id.)  Pina replied that he would check with "Michael," but that it is a "minor point" because he also wants to develop a long term relationship.  Pina also mentioned the possibility of recruiting another doctor. (Id.)  Later, Chervin says "if we have a doctor like Lynn, okay, it's very attractive.  I'm telling you right away, it's very attractive because this lady never was working in no fault.  So, so, . . . it's very attractive because insurance companies does not know her name, doesn't know ten or fifteen different medical P.C.'s and it's very good.  It's no red flags and this is very good to work with a person like this." (Id.)

On May 12, 2010, Aron Chervin used Chervin Phone 1 to call Vadim Chervin at the Law Offices of Akiva Ofshtein P.C. at 718-391-0228.  Aron Chervin asked when "Michael" would be

available for a meeting with "Jeff" the next day. (<u>See</u> intercept dated May 12, 2010, Gov. Mem. at 38-39.)  Vadim Chervin responded that "Michael" was not needed at the meeting about which doctor to bill under." (<u>Id.</u>)  Aron Chervin stated it would be at least a month before the P.C. paperwork goes through, and "she" was not willing to permit billing under her name.  "She" says, "we have to date before we get married." (<u>Id.</u>)  Later Aron Chervin stated that he is trying to meet with other doctors under whom he can bill and make "a ton" of money.  Vadim assured that neither he or "Michael" was needed at the next day's meeting, "if you really need us" Vadim Chervin said, "we will be right next to you."[5] (<u>Id.</u>)

On May 14, 2010, Aron Chervin used Chervin Phone 1 to call Vadim Chervin at the Law Office of Akiva Ofshtein, P.C. (Vassilakos Aff. 06/28/10 ¶ 39.)  Aron Chervin informed Vadim Chervin that he "texted two medical PC's to "Michael."[6] (<u>Id.</u>)  Aron Chervin said the two contracts must be drawn up similar to what Michael did for . . .(UI)[7]. (<u>Id.</u>)  Vadim Chervin then asks "what percentages, with whom, two medical PC's with whom?" (<u>Id.</u>)  Aron Chervin replied, "the name of the doctors are there, their addresses are there, the entire information is there." (<u>Id.</u>)  Vadim Chervin then asks Aron Chervin "with whom the contract has to be drawn up or who the funding company is?" (<u>Id.</u>)  To which Aron Chervin answers "at the moment it will be Ross." (<u>Id.</u>)  Aron Chervin next tells Vadim Chervin that "they are going on their own, without Tomek and Jeff." (<u>Id.</u>)  Vadim Chervin asks if "Michael" knows about this, and Aron Chervin explains that this is a new development about which Vadim Chervin must tell Michael. (<u>Id.</u>)  Aron Chervin tells Vadim Chervin that Michael "should get in touch with Ross and tell him that we will be giving them absolutely new bills.  What they do now, they do it with Jeff anyway,

---

[5] The Government inclusion of this statement indicates it must be relying on a line sheet not included in the applications submitted to the Court.  An affidavit should be submitted to the Court, although this evidence is not necessary for the Court's decision.

[6] The Government believed "Michael" to be Michael Lamond. (Vassilakos Aff. 06/28/10 ¶ 39, 40.)  Additionally, the Government does not believe Vadim Chervin to be a lawyer. (Gov. Mem. at 32.)

[7] "Unintelligible"

through, through, through Tomek." (<u>Id.</u> ¶ 39.)  Aron Chervin stated that Ross is constantly

asking him when their work will start. (<u>Id.</u>)  Vadim Chervin then asks if Michael knows what

percentages should be put in the contract. (<u>Id.</u>)  Aron Chervin replied "45 percent, the same thing

Mike has with Jeff." (<u>Id.</u>)  Aron Chervin consults with Slava and Luba in the background asking,

"so it's got to be written there, that it's going to be specifically neurological testing?"  Luba's

response is [unintelligible].  (<u>Id.</u>) Vadim Chervin then asked about what sums of money should

be put in to the contract. (<u>Id.</u>)  Aron Chervin replied that it might be different every week. (<u>Id.</u>)

Vadim Chervin asks if it should be a general contract then, not specific? (<u>Id.</u>)  To which Aron

Chervin replied "let him to draw up a general contract quoting the sums in the range between

50,000 and 150,000 dollars per week." (<u>Id.</u>)  Vadim Chervin wanted Aron Chervin to get in

touch with Michael  and Aron Chervin replied, "Mike should be familiar with this because it's

exactly the same arrangement he had with Jeff and Tomek." (<u>Id.</u>)  Aron Chervin continued, "we

will be doing the same stuff as Jeff, but independently." (<u>Id.</u>)  Vadim Chervin then inquired

about who would be doing the billing. (<u>Id.</u>) Aron Chervin replied, "this matter [unintelligible]

there is a girl over there who can do the billing but we want to put our person in your office and

we will be paying for that." (<u>Id.</u>)  Vadim Chervin agreed to the arrangement. (<u>Id.</u>)  Aron Chervin

then asked Vadim Chervin to call Michael as soon as possible to fill him in. (<u>Id.</u>)  Vadim Chervin

promised to do that right away. (<u>Id.</u>)

On May 14, 2010, Aron Chervin used Chervin Phone 1 to call Vyacheslav Dorber

("Dorber") at 845-541-1949  to talk about the conversation he had with "Michael." (<u>Id.</u> ¶ 40.)

Aron Chervin relayed an explanation of how the funding works. (<u>Id.</u>)  "Michael" said that they

bring the bills for tests to Michael and Michael reviews them, after that the bills are sent

overnight to Florida and they get paid in two days. (<u>Id.</u>)  Aron Chervin spoke with Michael about

paying Dorber "on the spot" when he brings the bill in. (<u>Id.</u> ¶ 40.)  Michael said it would be possible after they've worked together for awhile. (<u>Id.</u>)  Dorber informed Chervin that this is normal practice. (<u>Id.</u>)  Dorber stated that when he first started in the business he had to wait a week to get paid, which is not the case now that he is established. (<u>Id.</u>)  Dorber said he sometimes even gets paid in advance. (<u>Id.</u>)  Chervin and Dorber agreed that they have to hire their own billing person, teach her everything and have her sit in Vadim's office. (<u>Id.</u>)

Dorber then goes on to talk about how he started in the business and what it was like 8-10 years ago. (<u>Id.</u>)  Aron Chervin says he has a potential investor, a very rich Greek from Pennsylvania. (<u>Id.</u>)   Chervin wants to set up a meeting with Dorber and this Greek named Manny Soros. (<u>Id.</u>)   Chervin states that the Greek will set up a hedge fund, and bring in a bunch of other people. (<u>Id.</u>)  Dorber is enthusiastic about the idea and said that they would be able to make big money. (<u>Id.</u>)  Dorber and Chervin then discuss the timing of when to call the Greek. (<u>Id.</u>)  Dorber stated that it would be best to wait a month or two before calling the Greek. (<u>Id.</u>)  He stated that in a month or two they will know which company pays better and can use the Greek more wisely and make more money for themselves. (<u>Id.</u>)

On May 17, 2010, Aron Chervin used Chervin Phone 1 to call Lynn Braunstein at 917-797-1391 and instructed her to go to a medical clinic at 2100 Flatbush Avenue in Brooklyn, a new PC/medical office for the doctor. (<u>Id.</u> ¶ 41.)  Chervin stated that she must be there Wednesday from 11:00 am – 8:00 pm. (<u>Id.</u>)  Chervin stated that he wanted her to be "extremely aggressive." (<u>Id.</u>)  Braunstein told Chervin that "she is doing it for Chervin and she is doing it for herself," and that she will be "very aggressive." (<u>Id.</u>)  Chervin wanted to be able to book her four or five days a week, and he asked her if that was what she wanted. (<u>Id.</u>)  Dr. Braunstein replied "yea, yea, I will be." (<u>Id.</u>)  Chervin instructed her to use the template in all locations. (<u>Id.</u>)  Dr.

Braunstein asked if she should have them sign the other two forms, and Chervin said that she should. (Id.)

On May 19, 2010, Aron Chervin used Chervin Phone 1 to receive a call from Dr. Lynn Braunstein. (Id. ¶ 42.)  Dr. Braunstein said that she followed Chervin's instructions and then left. (Id.)  She told Chervin that she brought ten studies and the printouts with everything, including the needles and the consult. (Id.)  Chervin asked if she meant tests to which Dr. Braunstein replied "yea, yea, ten, ten, ten, test, yeah." (Id.)  Chervin then asked whether it was "the halves or its, ah, upper and lower or what." (Id.)  Dr. Braunstein replied that "yeah so, there's, um, three people I did uppers and lowers, and the other four were uppers or lowers." (Id.) Later, Dr. Braunstein stated "the, um, (UI) . . . the problem was that it is clear that they are very aggressive and that's good for their business.  However, this is Brooklyn and the place will close down in a month if I do uppers and lowers [tests] on patients that have no symptoms." (Id.)  Chervin replied that "I understand, you see there's always two sides to the matter . . . of course if, if, if, they have no symptoms, symptoms, it's no question about that." (Id.)  Later in the conversation, Dr. Braunstein continued, "I don't want the people who work here to be arrested and they want to make money and I want them to make a lot of money, but you have to make money and write everything down properly . . . the patient, patients were not giving me the information that could get the tests done." (Id.)

On May 20, 2010, Aron Chervin used Chervin Phone 1 to call Vladyslav Karabynosh. (Id. ¶ 43.)  Chervin stated, "the reason I am calling you, one of the uhh . . .uhh . . .our accounts that we have.  It produces good work.  He has 12 sets, ok?  Robik went to Queens right now to pick up some work, and this one called me saying urgently, that he has 12 sets.  And that I can come and pick them up if I want.  The question is simple, can you give us money for these 12

sets?" (Id.)  Karabynosh replied that he did not have any money. (Id.)

On May 27, 2010, Aron Chervin used Chervin Phone 1 to call Ariel Ilyasov. (Id. ¶ 44.)
Chervin left a voicemail message stating "this is Aron speaking once again.  This is my third
message.  I am leaving you my phone number.  I want to come to you.  I want to bring the sacks
to you, bring the money to you.  I don't understand why are you not calling me back.  This is
Aron, Robik's partner." (Id.)  Ilyasov returned Chervin's call and asked, "Aron, tell me, are you
coming by my place today?" (Id.) to which Chervin responded, "that's why I am calling, to set
things up with you.  I don't have your address and don't know anything." (Id.)  Chervin tells
Ilyasov to "text me the address, name of the clinic . . . your clinic and phone number." (Id.)
Chervin and Ilyasov agreed to meet later that day and Chervin explained "I need to go load up,
ok, with sacks and pick up my papers.  And then I will come to your place." (Id.)

On June 4, 2010, Aron Chervin used Chervin Phone 1 to call Galina Vovk. (Id. ¶ 45.)
Chervin stated that "they have only received one page. Ok. I can't stand at attention like a boy
scout in front of Dareo and look like an idiot.  I can't . . . there needs to be a full set of papers
there." (Id.)  Vovk then told Chervin, "we sent 4 pages." (Id.)  Chervin replied, "they have 10
sets that I delivered to them.  They need not only this, but it also needs to state that in these sets
[unintelligible] . . . ." (Id.)  Chervin continued, "they have not received anything else.  They need
to have people that are patients to sign in.  They need all of , however many pages there are in a
set." (Id.)  Robert Terdjanian, who was listening in the background, got on the phone and replied
"there are four" (Id.) and Chervin answered "four . . . it contains an assignment of benefits, it
needs to have a sign . . . there needs to be a signing receipt attached, so that there would be a
copy of what they . . . what was put in those sacks.  And what was in those sacks, I will tell you
frankly, I don't remember.  Take any first set from somebody, take the first set.  Because this

will be . . . this is a different office.  This not the same way we work with Dareo." (Id.)

Terdjanian replied, "that's why I will leave an empty one, and when they sign it," (Id.) to which

Chervin states, "No, no, Robik, no, don't leave an empty one.  He told me to fill in on that

receipt what you put in the sacks.  Take any first set, which you receive, and fill out—mattress,

board, cervical this ah collar, ok?" (Id.)

On June 4, 2010, Aron Chervin used Chervin Phone 1 to call an individual named Senya

at 727-902-6091. (Id. ¶ 46.)  Chervin explained that he had begun working in the medical

business. (Id.)  He stated that the business works as follows: "doctors are sent to various clinics

and they do neurological tests."  Chervin and his partner, "pay the doctors, we pay the clinics for

rent the day that the doctors are working there.  Then we gather the these tests and sell the tests

to a funding company." (Id.)  Chervin continued:

> There also needs to be a lawyer who will collect money from the insurance
> company for this funding company.  And if the lawyer is good, he will get the
> money back fairly quickly so funding company like packing easy funds so as to
> buy . . . (UI)(OV). Yes, so it's like there's a continual flow back and forth.  If, If,
> like, it happened with Slava where he is working with an attorney which Slava
> bought-eh, gathers the money, then they (UI). Regardless of how much they
> started out with, they finish with say, say, for example, a lot of money.  Say, one
> million a month, and even more than that . . .because of that, when I came to him
> by chance and said that I have a funding company, his ears stood up like a
> giraffe's and he, we, like, need each other. He does the tests and I provide you
> funding company and a lawyer's office, uh, well the one that Vadik and I have
> had for quite a while already.  About thirteen years probably.

(Id.)

## IV.   Discussion

## A.   Aron Chervin Was Knowingly Involved in a Scheme to Defraud No-Fault Insurance Providers.

The conversations of Robert Terdjanian recorded by the FBI establish probable cause to

believe that Terdjanian used Doctor 1's identification documents to establish a "clinic" at the

mail drop Coney Island address and that Medicare paid him $1.1 million in payments between July and September 2009 which were deposited in Doctor 1's HSBC account.  HSBC records for that account show $37,000 was disbursed to Telya Corp., owned by Terdjanian, and $429,000 was disbursed to "Oleg Kamarine," a known alias of Robert Terdjanian. (Koch Aff. 05/06/10 ¶ 21.)  Following the freeze on Terdjanian's Doctor 1 account in October 2009, Terdjanian and Aron Chervin became knowingly involved in a scheme with Terdjanian to defraud no-fault insurance providers.

### *AVR Medical Supply, Inc. and Teyla Corp.*

Based on authorized intercepts from telephone number 732-668-2716 subscribed in the name of Aron Chervin ("Chervin Phone 1") and prior authorized intercepts of phone number 718-213-9631 subscribed to Robert Terdjanian ("Robik Phone 1"), there is probable cause to believe that Aron Chervin and Robert Terdjanian formed AVR Medical Supply Inc. while using false names to disguise the true identity of its management.  Examination of Citibank records showed AVR opened a bank account in the name of "Valentina Babucea," president, with a home address known to be that of Terdjanian's father. (Koch Aff. 05/06/10 ¶ 24.)   AVR was described as a home-based medical supply company with one employee. (Id. ¶ 27.)  On January 11, 2010, Terdjanian used Robik Phone 1 to call his wife, Galina Vovk ("Vovk"), and asked her to call "Igor" at Chase Bank.  Terdjanian instructed his wife what telephone number to use, what address to use, and reminded her that "you know what's your name."  During her call to "Igor," Vovk identified herself as "Valentina Bubucea," and provided phone number 347-554-8454, and gave the "Coney Island Avenue address" as the principal office of AVR—a mail drop address previously identified with the Doctor 1 "clinic" in the earlier Medicare fraud investigation. Telephone records confirm that the telephone number provided by Vovk is associated with AVR

Medical Supply Inc. (Id. ¶¶ 19, 25.)

There is also probable cause to believe that Aron Chervin and Robert Terdjanian were planning to and did submit false invoices to no-fault automobile insurers.  On January 18, 2010, Chervin advised Terdjanian that he had a supplier who made everything in China, and would "beat any prices up" and "he will not be giving us invoices."  Terdjanian responded that "this is not a problem" and later says "we would have to pay a couple dollars to print invoices." (Id. ¶ 31.)  The documentation submitted by AVR to no-fault insurers included wholesale receipts from Telya Corp., a company formed by Terdjanian and associated with the receipt of fraudulent Medicare payments.  (Koch Aff. 05/06/10 ¶ 33; Vassilakos Aff. 06/28/10 ¶ 62.)  New York State insurance regulations allow a DME supplier to receive 150% of the wholesale purchase price from no-fault insurance providers. See 11 NYCRR 68, Appendix 17–C, Part F[a]. Consequently, there is probable cause to conclude that AVR did not submit invoices from the China supplier, but rather false invoices from Telya Corp. overstating their costs, as supporting documentation to no-fault insurers to receive more than AVR's 150% authorized mark up in payment.

The intercepted communications also provide probable cause that billings from AVR and doctors' clinics were mailed by Aron Chervin to the Law Office of Akiva Ofshtein, P.C. and reviewed by Michael Lamond, a lawyer at the Law Office of Akiva Ofshtein, P.C. before they were sent for payment to Florida. (See Vassilakos Aff. 06/28/10 ¶¶ 40, 62.)  The wiretaps also provide evidence that Aron Chervin instructed Michael Lamond to draft contracts between both doctors and funders by which the rights to payment of bills for doctor's service were transferred to funders in return for quick payment of a portion of the bills to reimburse the amount paid to the doctors for services—even though under New York law such assignment of fees is illegal,

see New York Education Law § 6530(19)—as well as rent, finder's fees and other costs of Aron

Chervin and his partners.  (See intercept dated May 12, 2010, Gov. Mem. at 38-39; Vassilakos

Aff. 06/28/10 ¶¶ 38, 40.)  Furthermore, the use of these funding agreements would serve to hide

from insurers that the doctors' bills for services were being shared by the funding investor,

causing a fraud on the insurance companies. (See Vassilakos Aff. 06/28/10 ¶¶ 38, 39.)

### *Fraudulent Medical Testing*

The wiretaps provide probable cause to believe that Aron Chervin had doctors fill out

blank prescriptions, a violation of established medical procedures, which AVR then filled out so

as to support their fraudulent billing of DME. (See Koch Aff. 05/06/10 ¶ 30.)

From the intercepted communications there is probable cause to conclude that Aron

Chervin and his clinics were creating fraudulent doctors' billings by instructing doctors to

provide aggressive and medically unnecessary testing on patients at the various clinics associated

with the fraud.  In one such instance, Chervin instructs Dr. Lynn Braunstein to be "extremely

aggressive" with her testing and she agreed to be aggressive. (Vassilakos Aff. 06/28/10 ¶ 41.)

The wiretaps show that Chervin found Dr. Braunstein a particularly qualified candidate because

of Dr. Braunstein's lack of prior interaction with no-fault insurance providers preventing any

"red flags" from being raised as to her testing regimen. (See id. ¶ 38.)  Dr. Braunstein, however,

cautioned Chervin about the need for the clinics which were "aggressive" to make sure the

paperwork and the patients were properly prepared so as to support the testing and not arouse the

suspicion of law enforcement and go to jail. (See id. ¶ 42.)

### *The Clinics*

The wiretaps provide probable cause to conclude doctors and clinics utilized by Aron

Chervin engaged in fraudulent and illegal fee sharing. (See id. ¶¶ 38, 39, 46.)  Chervin was

involved in paying and contracting to pay medical professionals by renting clinics for the day and having the professionals perform aggressive testing so that fraudulent billing could be submitted to the insurance companies. (Id. ¶ 46.)  The clinics and doctors were important to the scheme because their receivables were sold to funding companies. (Id. ¶ 39.)  The contracts with these funding companies were drawn up by "Michael" at the Law Office of Akiva Ofshtein P.C. and involve a percentage spilt of the fees with the funding company. (See id. ¶¶ 39, 46.)  In New York, however, it is illegal for medical professionals to share fees for professional services with any person other than a partner or associate in the professional firm or corporation. See New York Education Law § 6530(19).

There is probable cause to believe that the Law Office of Akiva Ofshtein P.C. received bills sent by Aron Chervin which the law firm then billed on their own letterhead. (Koch Aff. 05/06/10 ¶ 28.)  There is also probable cause to believe the bills sent by Aron Chervin to the law firm were fraudulent because they were accompanied by an assignment of benefits from the doctors given that Aron Chervin independently had paid the doctors for their services and paid the clinics for rent.  The bills directed that payment be made by the insurance companies to the law firm (Vassilakos Aff. 06/28/10 ¶ 46.) because the doctors obtained a receipt for services from the patient corroborating that they had received the services. (Id. ¶¶ 41, 45.)  There is probable cause to believe that Aron Chervin was making a great deal of money from this process.  This would not be true if the bills were for the actual amounts paid by Chervin to the doctors for their services and clinics for rent and the other amounts as authorized to be paid by the insurance policies, especially since the funders appear to be discounting Chervin's bills to make early, discounted payments to Chervin via the law firm, and were also making great sums of money in the process by collecting the full amount from the insurers. (See id. ¶ 39.)

B.      **Lamond**

Lamond claims that the conversations he is seeking to suppress took place in his capacity as legal counsel to Mr. Chervin and involved consultations regarding financing, no-fault insurance collections and arbitration matters. (Aff. of Michael Lamond 5/26/11 ¶ 5.) Specifically, Mr. Lamond states that the conversations are "on their face conversations between a lawyer and his client regarding legal advice in connection with their routine ongoing business transactions relating to no-fault insurance claims." (Def.'s Mem. at 4.)  There is nothing in the seized conversations, according to Mr. Lamond, that gives any "indication that they are related to the commission of a fraudulent act or any other offense." Id.  The conversations do show, however, that the Government has probable cause to believe that Aron Chervin intentionally and knowingly utilized the services of Michael Lamond to further Chervin's illegal scheme to obtain funds by submitting fraudulent medical bills, traveling in interstate commerce,  to no-fault insurance carriers. (Gov. Mem. at  37.)

V.      **Conclusion**

There is probable cause to believe that Aron Chervin was knowingly involved in a complex mail or wire fraud scheme to defraud no-fault insurance providers.  This suppression motion need not decide whether Defendant Lamond had actual knowledge of the fraudulent activity during his conversations with Defendant Aron Chervin.  The crime-fraud exception to the attorney-client privilege applies to this set of facts.  Therefore, Defendant's motion to suppress is denied.

IT IS SO ORDERED.

Dated:  New York, New York
        September ⸗ 2011

                                        Robert P. Patterson, Jr.
                                              U.S.D.J.

Copies of this Order sent to:

*Counsel for the Defendants:*

Joel Mark Stein
Joel M. Stein, Esq
39 Broadway suite 2420
New York, NY 10006
(212) 344-8008
Fax: 212-571-0860

George A. Farkas
George A. Farkas, Esq
32 Court St.
Brooklyn, NY 11201
(718)-625-2500
Fax: (718)-625-6837

Gerald J Di Chiara
Gerald J. Di Chiara, Esq.
404 Park Avenue South
New York, NY 10016
(212) 679-1958
Fax: (212) 689-3315

Samuel Gregory
Samuel Gregory P.C
45 Main Street
Brooklyn, NY 11201
(718)-222-2992
Fax: (718)-222-2889

*Counsel for the Government:*

Jason Peter Hernandez
U.S. Attorney's Office, SDNY
One St. Andrew's Plaza
New York, NY 10007
(212)-637-1024
Fax: (212)-637-2527

Rebecca Anne Rohr
U.S. Attorney's Office, SDNY
One St. Andrew's Plaza
New York, NY 10007
(212)-637-2531
Fax: (212)-637-2527

William Joseph Harrington
United States Attorney Office, SDNY
One Saint Andrew's Plaza
New York, NY 10007
(212)-637-2331
Fax: (212)-637-2937